All right, our final case for argument this morning is Ryan Lawrence Anthony v. Garrett May it please the court, Kurt Hermanson on behalf of Ryan Anthony. I'd like to start, yesterday I filed an erratum and hopefully the court has that. So basically what I put in my reply brief is that David Jorling was walking by the murder scene the night of the murder and when he talked to the police in 1980 on Tuesday, so the murder was most probably on Saturday, July 26th, he talked to the police on Tuesday when they met him at the library, he was studying for the bar and he was a critical someone who was in the Volks' home that they were able to do a sketch and his testimony made it more likely that it was serial killer Smith who committed the murders rather than Ryan Anthony. But then after filing the erratum yesterday, I re-read the rebuttal closing argument of the district attorney and understood why there's some confusion about when Jorling saw someone in the Volks' home. He argued throughout that Jorling was mistaken and it was actually the night of the murder which seems to me to fare for you actually. Correct, yes. I don't really know why you've been fighting that construction of it all along. Standing here today I think the most likely thing is, and I wasn't the trial attorney, standing here today I think the most likely thing is yes, the murder occurred at 10.30 on Saturday and Mr. Jorling was walking by then because the Volks' they went to church on Sundays and they didn't go to church that Sunday. So standing here today I believe that the district attorney's rebuttal closing argument, the last thing the jurors heard was what happened, that we have an eyewitness who is now, well I think he said in his opening closing argument, that's been their position all along. Anyway, and it makes sense. Yeah, so in 2007. But I think you better get to the stress of the argument. So yes, you have a little more support than you thought you did. Yes, Your Honor, and in 2007 Jorling, by then he doesn't remember, he's a city attorney and was a DA, but he's a very credible witness. Counsel, let me ask you this, because your arguments in the briefing as well, sounds in de novo review, but isn't our standard highly deferential under these circumstances? And the state court did make certain findings. Can you focus on those findings and tell me why they're an unreasonable application of the facts or law in this case? So the state court said that the declarant was singularly untrustworthy, he later disavowed his alleged inculpatory statements, he made disjointed and evasive statements, and that the corroboration is inadequate. So focusing on the facts, explain to me why they're an unreasonable determination. So first we don't concede that 2254D applies. We did analyze 2254D, but just as a threshold matter, if the state court didn't identify the right legal standard, then we might not even be in deferential territory. So if we look at the last reasoned opinion in this case, and that's State v. Anthony, there's no mention of chambers whatsoever. Let's assume that we're in deferential review land and proceed from there. So I think we win under all three parts of 2254D. So there's the contrary to clause, the unreasonable application clause, and the unreasonable determination of the facts. So under all three, I think we win, because the state court's analysis is not the chamber's analysis. What the state court did is they looked to Casares-Mendez, and Casares-Mendez says very narrowly, what you focus on in Oregon, under the Oregon Evidence Code, is the trustworthiness of the declarant. And what that did, what that analysis did, is it just condensed everything down into, is Mr. Smith, serial killer Smith, trustworthy? And that is completely the wrong analysis. The analysis under chambers is, how do we see if there are assurances of reliability? And chambers looked at three things for assurances of reliability. Chambers didn't limit its analysis to, let's just look at whether the declarant is reliable. That, respectfully, that's a ridiculous analysis, because he's a serial killer. He's not a trustworthy person. So what we look at is when he made these statements, not in 2006, not in 2007, when he confessed to being part of killing that poor couple in Oswego, Oregon, was it a statement against penal interest? And it absolutely was, because unlike the state court's analysis, he wasn't a convicted serial killer. He made that confession before he was ever convicted. He made that... To another serial killer. To another serial killer, to Mr. Jackson. Just to back up for a moment, could you just tell us what you think is the rule that chambers clearly establishes? Yes, Your Honor. So in chambers, we want to see assurances of reliability, and the way we determine that is three ways. First... As to what? As to whether a hearsay barrier to a mission of evidence about a third party is a constitutional due process violation. Yes, Your Honor, I would even... Is that right? Right. It's the right to present a complete defense, and I would even narrow chambers to cases in which there's a confession or at least statements against penal interest. So here, when we look at chambers, chambers has three things. First, were the statements made spontaneously to a close acquaintance shortly after the murder? Check. Second, are they corroborated by some other evidence? Check. Third, were they self-incriminatory? That is, were they against penal interest? All three of those things apply in this case. So, first of all... Isn't the most... One thing that struck me is that you don't really make anything out of this, but the most corroborative evidence with regard to Smith is that he was a serial killer in this precise area at this precise time of random people, and he was in Lake Oswego at least occasionally. That's correct. He's... That sort of all gets lost in the shuffle, but the fact is, this is not just somebody on the street that made this statement. It's somebody who actually was going around killing older people in their homes at this particular time in an area that included Lake Oswego. That's absolutely right. He is a serial killer in the area who's arrested August 22nd of 1980. He's committing murders in and around Oswego, Oregon. He... And the analysis in the state case just ignores all of that. I mean, the fact is that this is a person as to whom there was, you know, at least some reason to think that he could have done this because he did things just like it at just this time in this general area. And that's why the state court... That's right, Your Honor, and that's why the state court analysis is both contrary to and an unreasonable application of Chambers. So even assuming that they carefully looked at Caceres-Mendez, which does talk about Chambers, the last reasoned opinion in this case doesn't mention Chambers, and totally ignores the whole Chambers analysis. Instead, it myopically focuses only on whether Smith is a reliable witness. In 1980... So in Chambers, I mean, the Chambers court said you can't mechanically apply a hearsay rule, right, to defeat justice. And one of the things they emphasized there was that the statements involved in this case were made and offered at trial under circumstances that provided considerable assurance of their reliability. So why wouldn't it be reasonable for a state court to look at that and say, well, that suggests that we should make some assessment of the reliability of these statements. And if we think they're not reliable, Chambers doesn't require us to admit them. Why is that an unreasonable reading of the case? They do look at... They should look at reliability, but the fundamental flaw in the state court's analysis is they're looking at reliability in 2006, 2007, not in 1980 when the statements are made. And that's when they're against penal interest. Smith, like all the... Like in Holmes, in all of these cases, Supreme Court cases and Ninth Circuit cases, there's a recantation later, just like in Chambers. So we don't look at closing time to the trial, because they would all fail. Under the state court's analysis, they would all fail because they all recanted. The proper analysis is, under Chambers, is to look at the time that the statements were made against penal interest. Let me go back to my original question, because it, I don't think, is an accurate summation of the record to say that they focused only on the declarant's testimony. They did talk a lot about the untrustworthiness of his statement, the fact that he subsequently recanted, but they also said the statements were very disjointed, they were far from detailed, and it also talked about the opinion, the state court's opinion also talked about the weakness of the corroboration. So they're assessing, essentially, the reliability of the evidence that he wants to introduce. So tell me why, under the French review, that's a misapplication of facts. Because, again, when they're talking about it being evasive, his statements being evasive, they're not talking about 1980. They are not talking about his 1980 statements against penal interest. They're talking about, and they're quoting the appellate brief and saying, even his appellate attorney says that Smith was evasive. And the reason they say that he was evasive is they were arguing that he was unavailable because he was refusing to answer questions and was being evasive and saying, oh, I don't know how many people I killed. That's the evasive part in 2006. His supposed confession to Jackson, me and another person did that one, was far from detailed and was itself contradicted by his subsequent denials to, among others, Jackson. Further, as we noted in our first opinion, nothing in the circumstantial evidence that defendant cites bolster the theory that Smith was the perpetrator. Right. So they're looking at a recantation and saying, okay, so his first statements about being involved in the Oswego murders are unreliable because he recanted. But what is true, I think that the weakest part of his confessions is that they were very vague. I mean, in the other cases, they're often, the confession says something that the public wouldn't know and he said, like, a sentence. He certainly didn't say anything that makes his confession. It's at the time he made it. It's true that his confessions are not as detailed as in... Well, they're not detailed at all. I mean, all he said was, you know, I killed the people, or not even killed them, I did the crime in Oswego with those people. Something like that. And we're talking about the right to present a defense, and here... Right, I understand that. So, yeah, I don't... But that's the case where your case and the other's fit the worst. I'm sorry? That's the situation as to which your case and the Chamber's line of cases fit the worst. That is the detail. But maybe it's made up for by the fact that this guy was a serial killer in the area at the time doing similar crimes. And that makes this case a lot stronger than Chambers and the other cases, is we know for a fact that he is a serial killer in that area at the time, and Jackson did say that Smith told him that he got money from those people in Lake Oswego,  reserve the rest of my time. All right. Thank you. May it please the Court, Patrick Ebbitt for the State of Oregon. Like Petitioner, I'll begin with the Chamber's issue. And first, as the Court has noted, this is an EBBA case. So the question is whether the Oregon Court of Appeals analysis was objectively unreasonable. That is, whether its conclusion that Smith's statements were insufficiently reliable under the due process factors as outlined in Chambers was so unreasonable that no fair-minded jurist could disagree. Petitioner has not met his burden to show that in this case. And I'll begin... Which... What is the ER page on which the relevant discussion occurs? I'm sorry? What is the ER page on which the relevant State court discussion occurs? I don't have the ER at my fingertips. I do have the Court of Appeals decision in fact... All right. Are we talking about the... State v. Anthony, 247 ORAP, 582, at 585 and 586. That is the 2012 decision. The 2012 decision refers back to the 2010 decision, which also makes... Oh, excuse me, it's ER 149. Thank you, counsel. And ER 149 and following. So that's generally where they are. But those two opinions both contain the Oregon Court of Appeals analysis. The Court of Appeals in its 2012 opinion refers to its 2010 analysis. So you need to look at them together. With that, I do want to touch on this matter of Mr. Jorling. Petitioner's argument at the pretrial proceeding on his motion to allow Smith's hearsay statements was that they were corroborated because Jorling saw motorcycles the evening after the murder and saw this person, glanced at this person backlit at the doorway of the Volk's home the evening after their murders. And the defense theory was that the murderer had returned the day after their murder. That was the defense theory at the pretrial proceeding. They were not arguing that somehow Mr. Jorling was mistaken. They were simply saying that he was seeing the murderer return to the scene 24 hours later. That was the theory not only at pretrial but also at trial and before the jury. That was the defense theory. So now we're hearing for the first time a new defense theory that Jorling was mistaken. That was the government's theory. That was the government's theory at trial. The government's theory was that Mr. Anthony was the killer. But that this witness had the wrong day. Yes. On rebuttal that was... I think it was also said on the opening argument. I'm not sure. It may have been. The record is voluminous. But that was the government's theory all the way through. But that was not Petitioner's theory. So what we're looking at, what the Court of Appeals was facing when it was a Petitioner's theory that this was a return of the killer scenario that the Petitioner was advocating, that's the record that the Court of Appeals was looking at. But even assuming... Let's assume for the sake that theory is correct. Let me go back to the point I was making before. In this paragraph in the government, in the Oregon Court of Appeals 2012 decision, the one thing that's never mentioned as to circumstantial evidence is that the person who confessed was a serial killer in the area at the time preying on older people in their homes and at least one occasion with a knife. That is certainly relevant circumstantial evidence as to the reliability... You just had some person on the street saying this and acting the way this person did. That would be one thing. But in fact, you have somebody who you had at least some reason to think was committing crimes of this kind at that time in this place and so on. Mr. Smith was a killer, as was Mr. Jackson, and they murdered people in the greater Portland area with a population of 2.2 million people. And Mr. Smith was... It was also established that he had family in Lake Oswego and he went there occasionally, and I don't remember if any of his crimes were committed there. They were committed at least nearby. So all of that is some circumstantial evidence. Mr. Smith committed murders in Washington, in southern Washington. He committed murders in the Portland area. Yes, he was a bad dude. That's undisputed. But what we have... We know one thing, bad people like that... And he committed murders going to the homes of elderly people as well. I don't recall the victims necessarily being some sort of profile that they were elderly people. They were elderly people. Some of them were elderly people and some of them were in their own homes. Yes, he was a home invasion robber. There's no question about that. He... The fact remains that his... ...confession to Smith, to Jackson, was highly vague. It was... Jackson himself described it as boasting. We know that people in this... But the question here is whether Anthony could put it as a defense. It is the scope of Anthony's due process rights to put on a defense. Right? That's the question here. And the fact is that there was... Anthony's alibi was pretty weird. But he was fervent about it and he had at least... He had somebody confessing even if briefly to somebody he knew right after the crime against his penal interest before he'd been charged with anything. And there was a fair amount of corroboratory evidence. Not enough to think that... We're not trying to reach a standard of beyond a reasonable doubt or even a preponderance of the evidence. Right? We're just trying to reach a standard that this is reliable enough that the jury should be able to consider it, essentially. I think the standard that is articulated by this Court and Gable in other cases is persuasive assurances of trustworthiness is how this Court has characterized the Chamber's standard. And what we don't have here are those persuasive assurances of trustworthiness. What we have is a bragging serial killer. And examine these corroborating circumstances a little bit. They really... The Oregon Court of Appeals determination that these corroborating circumstances were, quote, a far cry from the kind of corroborating circumstances we see in Chambers and cases applying Chambers was certainly not objectively unreasonable. There was... Even assuming Jorling was mistaken as to the date and that he actually walked by the night of the murder, we have motorcycles. And the fact that Smith rode a Honda motorcycle and apparently one of these motorcycles may have been a Honda motorcycle, that is hardly a mark of Zorro. That's hardly unique. It's summertime on the West Coast. Motorcycles are common. They were part... And that doesn't establish much of anything. He took a glance, in his words, at the doorway and saw a backlit figure. The record is... Does not demonstrate that this person looked more or less like Smith or more or less like Petitioner. There was some dispute about that at the pretrial hearing. But there was no... One observer said, no, I think it looks more like Smith. Other one said, no, I think it looks more like Petitioner. There's nothing persuasive about that. Why isn't that a question for the jury? That's one of the things that Gabel keeps saying, that ultimately, if there's a dispute about things, it's for the jury. So... The rule against hearsay is grounded in the notion that statements under oath are more trustworthy than statements out of court. That is a time-honored rule. And what Chambers stands for says, in certain narrow circumstances, when those out-of-court statements bear incredible indicia of trustworthiness, we will admit them. It doesn't simply say, it doesn't do... Chambers takes pains to explain. It's not just saying, point blank, the hearsay rule doesn't apply to criminal defendants. If this evidence were put on, the government obviously could put Smith on to deny it, right? If this evidence had been put on, the government could have put Smith on to deny it, to deny that he said it, to deny that he did it. Correct. So, it's not like this was going to come in without refutation. Excuse me? It's not that it was going to come in without refutation or without somebody under oath. I mean, Smith can come in and say under oath whatever the government wants him to, whatever he agrees to say under oath. I mean, that would simply do away with the trustworthiness. It would just simply say, okay, since the person's available, which is kind of in conflict with federal rules of evidence that say that hearsay evidence of this type should only come in if the witness is unavailable. But be that as it may, simply because the witness is available doesn't mean it simply all comes in. That's not what Chambers stands for. Chambers says there has to be persuasive assurances of trustworthiness, real corroboration. In Chambers, you know, McDonald made multiple confessions to close friends shortly after the crime. One witness testified that they saw McDonald commit the shooting. We don't have anything like that here. Not even anything close to anything like that here. And nor do we have anything like this Court's most recent case analyzing Chambers, Gable. Not only was Gable not an AEDPA case, but Gable, there were really, you know, there was a very detailed confession that included facts that only the killer would know. We don't have anything like that here. Nothing even close. In fact, and I think this is when I was looking at Gable, one thing I noted in Gable was that Gable himself made statements implicating his guilt. He said he did it to a number of different people, including his wife. Yet this Court found that he met this shock gateway for actual innocence and noted that, yeah, these were just boasts. It's not uncommon for people particularly in this milieu to make idle boasts. That doesn't mean these boasts are true or they bear any kind of assurances of trustworthiness, and that is not the circumstance here. Before you run out of time, Counsel, can you briefly address the question of prejudice? Let's assume for the sake of argument a Chamber's error. In particular, what were the statements about the pillow case, the DNA evidence found on the pillow case? Right. Bluntly, this case is not a whodunit. I'm sorry, I didn't hear the last thing you said. This case is not something. This case is not a whodunit. The petitioner was, and this was sort of the compelling reason why the State finally charged this case, the DNA technology finally developed to a point where they could analyze this improperly. Yes, about eight years before they actually did the DNA. Right. The pillow case, when it was found, was in the drawer? Was it a closed drawer? It was in a bureau. I don't recall whether the bureau was closed or not. I believe it was, but it was at least partially closed. But that was incredibly compelling evidence because not only did the petitioner acknowledge that he was at the scene shortly after the murder, that he had dragged the bodies around, but the evidence that his blood was at the scene, not only on the towel, but in the pillow case, in a bureau, suggested that... He had a specific explanation for why his DNA would be on the pillow case, did he not? Excuse me? He had a specific explanation. He indicated that he had, he tended to chew his nails and perhaps that was why his blood was on the pillow case. But that was hardly plausible. The far more rational explanation was that he had, after the murder, he had gone searching for the victim's money and had rifled through the bureau with his bloody hand and that's how the blood ended up on the pillow case. I have a question, which is what... He acknowledges he was there and he acknowledged that he touched, and he acknowledged way back that he had touched, he had specifically, I think, identified the towel and the pillow case. He did not acknowledge that he touched the pillow case initially. You mean before they... He only acknowledged that he did not, in his statements to the detectives, he did not mention anything about... The initial statement, volunteering that he was at the scene, said he'd wiped his hands on the towel. And there was no mention of the pillow case? No mention of the pillow case, no mention of being in the bureau. This was all something that... But the one thing, it seems to be agreed upon now, but I'm not sure why, that the DNA had to be his blood and couldn't just be his touching things. Right. There was no dispute... Why is that? I'm just curious about why. I think it was given the volume. There were blood drops on the pillow case. I don't think this was the kind of thing where the petitioner was in a position to argue that the DNA on the pillow case was not from his blood. I don't think that was something that he even attempted. I think they said that at some earlier point, but by the time of the trial, they seemed to be agreeing that it was his blood, but I'm not sure why. Okay. Maybe I will ask that to your opponent. I see I'm out of time. Thank you. Thank you, counsel. So, just to jump right into prejudice, I don't think it applies. And if we look at Holmes v. South Carolina, there, Justice Alito, writing for the unanimous court, said that you can't have a rule where you exclude third-party culpability evidence just because the forensic evidence is overwhelming. And so Justice Alito, writing for the Supreme Court, reversed and said you have to let that in. And we don't concede that it was blood. If we do say blood in the briefing, my apologies. Because there is no ABO. There's always been a dispute. I know that, and by that they say it's because you needed more... I don't know whether that was ever discussed at trial. At trial, there were a number of discussions about, like, it could be sweat, it could be transfer touch. So the DNA evidence is not conclusive. Not only in the brief, but I think in the arguments at trial to concede that it was blood. The argument was it could be a bunch of different things and not blood. And there was cross-examination about... Is it correct that in his initial statement he did not mention the pillow case, and then subsequently when his DNA was discovered, then there was an explanation as to why his DNA might have landed on the pillow case? I don't know that he was asked about the pillow case, and I know that when he talked to the police, he stopped talking to them. So there may not have been time. Go ahead. I'll give you extra time. What is the explanation on why his DNA was on the pillow case that's inside of a drawer or a bureau? I would have to re-review what his testimony was at trial. I'm not remembering right now. I can submit that to the court in a letter. No, that's fine. I did review that portion of the record offhand. I can't remember exactly what the explanation is, but I know there was an explanation as to why he walked over and put it back in the bureau. There is an explanation, and I don't want to get it wrong. I don't want to give the wrong answer. That's fine, counsel. So, Your Honors, there is corroboration. There is assurances of reliability. Lake Oswego is a small community. The motorcycles are a big deal. They noticed that it was suspicious. They're new motorcycles. They match the motorcycle that Smith was driving. So that makes it more likely that it was Smith and not Anthony. There were two motorcycles, two men, and Smith said that he committed the crime with Atherton. Atherton had a car. We don't know about the other motorcycle. But it tends to show that Smith, the serial killer, committed the murders, not Anthony. Serial killer Smith told Jackson he got money from people in Lake Oswego. The modus operandi of Smith, as Judge Berzon is very familiar with, separates this case from all the other cases and makes it stronger, makes it more reliable. In the other cases, we didn't have a known serial killer. It denied him his right to present a complete defense to say the jury doesn't get to know. We're going to usurp the jury's function and not let them know that the serial killer is committing crimes in that area. How is Chambers supposed to operate? You have this language in Chambers and in Gable about it has to be persuasive or reliable. That seems to build in some second-guessing of the jury because it has to be persuasive. Persuasive to who, presumably? It can't be unrelated. Is that to be possibly persuasive to a jury? What are we saying? There are assurances of reliability because of the location, the modus operandi. The confessions aren't just that they put him in like Oswego. It's not that it's just speculation. There are assurances of reliability. There are indices of reliability. That's what I'm trying to find out. How strong does this have to be? From my part, I don't see why it has to be all that strong because you think it's going to a jury, but the language in the opinions seems to be talking persuasive, reliable assurances. I think the reason is because it's a due process violation. It's funny that it's just due process because they talk about compulsory process. They talk about the Sixth Amendment. Actually, the Supreme Court doesn't really decide. Is it all of those things, the right to have people testify? But they call it the right to present a complete defense. That was denied here because of... Now, you could have called Smith. We know what Smith would have said. You could have cross-examined him with what he said earlier and presumably with all his earlier crimes and exactly what they were and where they were and so on. Why wasn't that adequate? I don't know why the trial attorney didn't do that. Jurors want a narrative and they want to be able to connect the dots and without Jackson's testimony about that... And Jackson believed the statement. But I presume they could have cross-examined Smith by reading what he said to Jackson. He could have just denied it. He would have denied it. And he would have been evasive just the way he was. And then could they have brought Jackson on to say he actually just said this to me at that point? I'm sorry? If that happened, could they then have brought Jackson on to prove that he did say it to Jackson? They could have skipped a step here. Would the case look different if they had tried to put it on through Smith and then brought Jackson in to say whatever he was going to say? I think from the pretrial hearings it was clear the judge wasn't going to allow any of it. So you don't think that would have been allowed either? I don't think it would have been allowed based on the pretrial rulings. All right. Thank you. Our questions took you over time, but we appreciate you standing up at the lectern for an extra time and answering our questions. I really appreciate the arguments from both sides. The matter is submitted and we are adjourned for the day.
judges: BERZON, NGUYEN, MILLER